IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
AMERICAN TALENT AGENCY, INC.,

                                        *Plaintiff*,

                                                        Case No. 08 Civ. 4541

v.

ROWE ENTERTAINMENT, INC., LEONARD ROWE,
N&D ENTERTAINMENT, INC., NEAL WILSON and
DESHANNA WILSON,

                                        *Defendants*.

-------------------------------------------------------------------x


### DEFENDANTS NEAL WILSON, DESHANNA WILSON AND N&D ENTERTAINMENT'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS OR *IN THE ALTERNATIVE* TO TRANSFER VENUE


**AKERMAN SENTERFITT LLP**
*Attorneys For Neal Wilson,*
*Deshanna Wilson, and N&D Entertainment*

335 Madison Avenue, Suite 2600
New York, New York 10017
Telephone:  212.880.3800
Facsimile:  212.880.8965


*Of Counsel:*

        Donald N. David (DD 5222)
        Brian A. Bloom  (BB 5722)

# Table of Contents

Table of Contents ........................................................................................................ i

Table of Authorities ................................................................................................. iii

Preliminary Statement ............................................................................................. 1

Background Facts .................................................................................................... 1

ARGUMENT ........................................................................................................... 4

POINT I:  This Matter Should be Dismissed for Lack of Personal Jurisdiction ............... 4

POINT II:  The Convenience of the Parties and the Interests of Justice Compel this Honorable Court to Dismiss this Case or in the Alternative to Transfer Venue to the Middle District of Georgia ......................................................................................... 5

A. The First-to-File Doctrine Dictates Transfer ...................................................... 6

B. There Are No Special Circumstances Present Here ............................................ 8

C. This Case Should Be Dismissed On The Grounds of Forum *Non Conveniens* under Fed. R. Civ. P. 12(b)(3)................................................................................... 9

(1) Plaintiff's Choice of Forum ...................................................................... 10

(2) An Adequate Alternative Forum Exists ..................................................... 10

(3) Private and Public Interests Weigh In Favor of Dismissal......................... 10

D. *In The Alternative* The Convenience of the Parties and Witnesses Compels This Honorable Court to Transfer This Case to the U.S. District Court for the Middle District of Georgia ........................................................................................ 11

(1) Plaintiff's Choice of Forum Dictates Transfer .......................................... 12

(2) Convenience of the Witnesses and Parties Dictates Transfer .................... 12

(a)  Convenience of the Parties ................................................................ 12

(b)  Convenience of the Parties' Witnesses .............................................. 13

(3) Non-Parties Subject to Subpoena Power.................................................. 13

(4) Availability of Documentary Evidence...................................................... 13

(5) Relative Burden of Expense to the Parties ............................................................. 14

(6) Degree of Interruption ................................................................................................. 14

E.  Judicial Economy Dictates That This Action Be Transferred To The Middle
     District Of Georgia ...................................................................................................... 14

**Conclusion** .............................................................................................................................. **17**

# Table of Authorities

**Federal Cases**

*800-Flowers, Inc. v. Intercont'l Florist, Inc.,*
    860 F. Supp. 128 (S.D.N.Y. 1994) ........................................................................ 6, 8,12

*Alfadda v. Fenn,*
    159 F.3d 41 (2d Cir. 1998) ........................................................................................ 9

*D.H. v. Gottdiener,*
    462 F.3d 95 (2d Cir. 2006) ................................................................................... 9, 14

*First City Nat'l Bank & Trust Co. v. Simmons,*
    878 F.2d 76 (2d Cir. 1989) ...................................................................................... 6, 8

*Guidi v. Inter-Cont'l Hotels Corp.,*
    224 F.3d 142 (2d Cir. 2000) ..................................................................................... 10

*Gulf Oil Corp. v. Gilbert,*
    330 U.S. 501, 67 S.Ct. 839 (1947) ........................................................................ 9, 10

*Int'l. Shoe Co. v. Washington,*
    326 U.S. 310, 66 S.Ct. 154 (1945) ............................................................................. 5

*Iragorri v. United Techs. Corp.,*
    274 F.3d 65 (2d Cir. 2001) ........................................................................................ 9

*J. Lyons & Co. Ltd. v. Republic of Tea, Inc.,*
    892 F. Supp. 486 (S.D.N.Y. 1995) ............................................................................. 7

*Levitt v. Maryland Deposit Ins. Fund Corp.,*
    643 F. Supp. 1485 (E.D.N.Y. 1986) ......................................................................... 16

*Moore v. New York Cotton Exch.,*
    270 U.S. 593 (1926) ................................................................................................. 7

*Motion Picture Lab. Technicians Lo. 780 v. McGregor & Werner, Inc.,*
    804 F.2d 784 (2d Cir. 1986) ...................................................................................... 6

*Nat'l Patent Dev. Corp. v. Am. Hosp. Supply Corp.,*
    616 F. Supp. 114 (S.D.N.Y. 1984) ............................................................................. 8

*Nat'l Union Fire Ins. v. Turtur,*
    743 F. Supp. 260 (S.D.N.Y. 1990) ............................................................................ 16

*Piper Aircraft Co. v. Reyno,*
   454 U.S. 235, 102 S.Ct. 252 (1981) ............................................................ 9

*PT United Can Co. v. Crown Cork & Seal Co.,*
   138 F.3d 65 (2d Cir. 1998) ....................................................................... 10

*Rush v. Savchuk,*
   444 U.S. 320, 100 S.Ct. 571 (1980) ............................................................ 4

*Schneider v. Sears,*
   265 F. Supp. 257 (S.D.N.Y. 1967) ......................................................... 8, 14

*Stewart Org., Inc. v. Ricoh Corp.,*
   487 U.S. 22 (1988) .............................................................................. 8, 14

*Younis v. Am. Univ. in Cairo,*
   30 F. Supp.2d 390 (S.D.N.Y. 1998) ........................................................... 9

**State Cases**

*Bigley v. Mosser,*
   235 Ga. App. 583 (GA 1998) .................................................................... 7

*Ideal Leasing Servs., Inc. v. Whitfield Cty.,*
   254 Ga. App. 397 (GA 2002) .................................................................... 6

**Unreported Cases**

*Calgarth Inv., Ltd. v. Bank Saderat Iran,*
   1996 WL 204470 (S.D.N.Y. April 26, 1996) ............................................... 10

*Reinhard v. Dow Chem. Co.,*
   2007 WL 2324351 (S.D.N.Y. Aug. 13, 2007) .............................................. 12

*U.S. Banknote Corp. v. E. Bickel & Co. GmbH,*
   1993 WL 8165 (S.D.N.Y. Jan. 5, 1993) ..................................................... 15

**Statutes**

28 U.S.C. 1441 .................................................................................... 4

28 U.S.C. 1404(a) ......................................................................... *passim*

28 U.S.C. 1441(d) .................................................................................................................. 4

Fed. R. Civ. P. Rule 12(b)(2) ........................................................................................ 1, 4, 17

Fed. R. Civ. P. Rule 12(b)(3) ..................................................................................... 1, 5, 9, 17

Defendants Neal Wilson, Deshanna Wilson, and N&D Entertainment (collectively "the Wilson Parties" or the "Wilson Defendants") respectfully submit this Memorandum of Law, pursuant to Rule 12(b)(2) and Rule 12(b)(3) of the Federal Rules of Civil Procedure, in support of their motion for an Order dismissing all claims against the Wilson Parties in the Complaint filed by Plaintiff American Talent Agency, Inc. ("ATA" or "Plaintiff") on or about April 24, 2008 (the "Complaint" or the "New York Complaint").[1]  In the alternative, this memorandum is submitted pursuant to 28 U.S.C. § 1404(a), in support of the Wilson Parties' motion to transfer venue of this case to the United States District Court, Middle District of Georgia, for the convenience of the parties and witnesses, in the interest of justice and for the sake of judicial economy.[2]

## BACKGROUND FACTS

Neal and Deshanna Wilson (sometimes collectively referred to herein as the "Wilsons") are husband and wife, presently residing in the County of Richmond, Georgia.  *See* Affidavit of Deshanna Wilson ("Wilson Aff.") at ¶ 1, annexed to the Bloom Decl. as Exhibit "B".  Neal and Deshanna Wilson are the principals of N&D Entertainment ("N&D"), a concert-promotion company.

In or about May 2007, the Wilsons received a phone call from Peter Seitz, the CEO of ATA, regarding an investment opportunity  in connection with a series of music concerts (the "Concert Series") featuring the recording artists Janet Jackson and Robert Kelly p/k/a R.Kelly

---

[1]    ATA filed this action in New York Supreme Court, Westchester County, under Index Number 08-09468.  On May 16, 2008, the Wilson Parties filed a Notice of Removal removing the case to the Southern District of New York.

[2]    A case involving substantially the same parties and similar issues is currently pending in the Superior Court of Muscogee County, Georgia (*Emory Alexander, et al. v. Rowe Entertainment, Inc. et al.*, Index Number SU08-cv-1535-05).  If the instant matter is transferred to the Middle District of Georgia, there is the potential for future consolidation with the Georgia State Court action.

(the "Investment Opportunity").[3]  *Id.* at ¶¶ 4-5.  During the course of this phone conversation, Mr. Seitz indicated that the promotion for the Concert Series was to be overseen by Leonard Rowe, a man previously unfamiliar to the Wilson Parties.  *Id.* at ¶ 6.  At the recommendation of Mr. Seitz, Mr. Rowe was conferenced into the phone call to further discuss the Concert Series and the Investment Opportunity.  *Id.*  The Wilsons indicated that they needed time to consider the Investment Opportunity.  *Id.* at ¶ 9.  Over the course of the next few weeks, Mr. Rowe visited the Wilsons at their Georgia home several times in an effort to convince the Wilsons to invest in the Concert Series.  *Id.* at ¶ 10.  During this period of time, Mr. Seitz called the Wilsons on an almost daily basis to reassure the Wilsons that the Investment Opportunity was a solid one.  *Id.*  As a result of the repeated assurances of both Mr. Seitz and Mr. Rowe, the Wilson Parties invested approximately $400,000 in the Concert Series.  *Id.* at 12.

The Wilsons Parties ultimately reached an agreement with Mr. Rowe and Mr. Seitz, (who the Wilsons believed to be partners), that, based on the Wilsons' investment, the Wilson Parties would own a fifty-percent (50%) interest in <u>all</u> concert show dates (which made up the Concert Series) except for ten (10) such shows, in which case they would own a twenty-five percent (25%) interest.  *Id.* at ¶ 14; Declaration of Brian A. Bloom ("Bloom Decl."), Exhibit "A", annexing a copy of the Georgia Complaint, at ¶ 29.  Unbeknownst to the Wilson Parties, in a scheme reminiscent of The Producers, Mr. Seitz and Mr. Rowe, along with the other Georgia Defendants, had fraudulently induced other individuals to similarly invest in the Concert Series, such that for any given show more than one-hundred percent (100%) of the ownership interest had been sold.  *See* Bloom Decl. Exhibit "A", at ¶ 29.

In addition to fraudulently inducing the Wilson Parties (and the other Georgia Plaintiffs)[4] into investing in the Concert Series and providing inaccurate information regarding the participa-

---

[3]      Although the Concert Series was originally to feature Janet Jackson and R. Kelly, Janet Jackson declined to participate, and instead the Concert Series featured R. Kelly, as well as two other supporting artists.

[4]      *See infra*, "The Georgia State Court Action."

tion of other investors in the Concert Series, Mr. Rowe and Mr. Seitz, along with the other Georgia Defendants, misrepresented to the Wilson Parties the profitability of the Concert Series. *Id.* at ¶ 49. Not only were the Wilson Parties never paid monies due to them as a result of the profitability of the Concert Series, the Wilson Parties were never repaid the bulk of their initial investment in the Concert Series, despite due demand for the same.

### The Georgia State Court Action

On or about April 17, 2008 (before the filing of the within action in Westchester County Supreme Court), Neal and Deshanna Wilson, along with eight other individuals who had been similarly defrauded (collectively, the "Georgia Plaintiffs"), commenced an action in the Superior Court of Muscogee County, Georgia (the "Georgia Action" or the "First Action"), against Rowe Entertainment, Inc. ("Rowe Entertainment"), Leonard Rowe, ATA, Peter Seltz, and two other individuals (collectively "the Georgia Defendants"). *See* Bloom Decl. Exhibit "A". The Georgia Complaint alleges claims under tort and breach of contract theories, as well as civil RICO violations, arising out of the Georgia Defendants' fraudulent inducement of the Georgia Plaintiffs to invest in the promotion of the Concert Series. A copy of the Complaint in the Georgia Action is attached as Exhibit "A" to the Bloom Decl. submitted herewith.

### The New York Action

On or about April 24, 2008, exactly one week *after* the Georgia Action was filed, ATA filed the within action in New York State Court against Rowe Entertainment, Leonard Rowe, N&D, Neal Wilson and Deshanna Wilson (collectively, the "New York Defendants") seeking to collect monies allegedly due to it as a result of the Concert Series.[5] The New York Complaint fails to set forth any basis for personal jurisdiction over any of the New York Defendants and similarly does not allege that any of the New York Defendants have sufficient minimum contacts with New York to satisfy due process.

---

[5]    Upon information and belief, the New York Action was filed by ATA in anticipation of and in response to the Wilsons' threatened litigation in Georgia (which had already been commenced on or about April 17, 2008).

On May 16, 2008, pursuant to 28 U.S.C. 1441, et seq., the Wilson Parties filed a Notice of Removal in the Southern District of New York, removing the New York State action to federal court based on diversity jurisdiction.[6]

## ARGUMENT

### POINT I.

### THIS MATTER SHOULD BE DISMISSED
### FOR LACK OF PERSONAL JURISDICTION

One of the most basic principles of civil procedure is that a court must have personal jurisdiction over the defendants. Where personal jurisdiction is lacking as to any defendant, the court should dismiss the action as against that defendant. *See* Fed. R. Civ. P. Rule 12(b)(2); *Rush v. Savchuk*, 444 U.S. 320, 332, 100 S.Ct. 571, 572 (1980). In the instant case, not only is there a blatant lack of personal jurisdiction over the Wilson Parties, Plaintiff does not even attempt to provide or allege such a basis. Not only does the within Complaint not address personal jurisdiction and venue, it actually lays the foundation for establishing that personal jurisdiction with respect to the Wilson Parties is lacking.

The Complaint states that, "defendant N&D was and is a Georgia corporation with its principal place of business located at . . . 2607 National Wood, Augusta, GA 30904." It also states, "defendant Mr. Wilson was and is a natural person residing within the State of Georgia, Richmond County" and "defendant Mrs. Wilson was and is a natural personal residing within the State of Georgia, Richmond County." New York Complaint ¶¶ 4, 5, and 6 respectively (emphasis added). Not only does Plaintiff admit and allege that all the Wilson Parties are residents of Georgia, Plaintiff provides no alternative basis for personal jurisdiction over the Wilson Parties in New York, and indeed no such basis exists.

---

[6] Pursuant to 28 U.S.C. 1441(d), the Wilson Parties promptly gave written notice of removal to ATA, Rowe Entertainment and Leonard Rowe, and filed with the Westchester State Court a Notice of Filing of Notice of Removal.

The Wilsons are neither residents of New York nor domiciled within this State. Service of the Summons and Complaint was made on May 5, 2008 by personal service upon the Wilsons <u>outside</u> the State of New York, in Augusta, Georgia. *See* Wilson Decl. at ¶ 21. N&D is neither licensed to do business within the State of New York, nor does it actually conduct any business within the State. *See id.* at ¶ 20. None of the transactions relevant to the instant action took place in New York, and Plaintiff does not even attempt to allege otherwise. *See id.* at ¶¶ 18 -19. In short, there is absolutely no basis articulated in the New York Complaint conferring personal jurisdiction over the Wilson Parties in New York. Simply put, venue is improper and personal jurisdiction is lacking.

Moreover, the Wilson Parties have insufficient minimum contacts with New York to satisfy the due process requirements. *See Int'l. Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154 (1945). Therefore, as no personal jurisdiction exists over the Wilson Parties, all claims asserted in the New York Complaint against the Wilson Parties must be dismissed as the action here cannot be maintained against them as pled.

## POINT II.

### THE CONVENIENCE OF THE PARTIES AND THE INTERESTS OF JUSTICE COMPEL THIS HONORABLE COURT TO DISMISS THIS CASE OR IN THE ALTERNATIVE TO TRANSFER VENUE TO THE MIDDLE DISTRICT OF GEORGIA

The Wilson Parties respectfully request this Court to dismiss this case under the first-to-file doctrine and under Fed. R. Civ. P. 12(b)(3) *forum non conveniens*, or *in the alternative* to transfer this case, pursuant to 28 U.S.C. 1404(a), to the Middle District of Georgia for the convenience of the parties and witnesses and in the interests of justice.

Simply put, this case lacks any true connection to New York. Not only is there no personal jurisdiction over the Wilson Parties in New York, none of the events relevant to this action even occurred in New York. Moreover, a substantially similar action involving the same issues

and most of the same parties is currently pending in the Superior Court of Muscogee, Georgia and had been commenced prior to the instant action.

## A.    The First-to-File Doctrine Dictates Transfer

The "well-settled principle" in the Second Circuit is that "where there are two competing lawsuits, the first should have priority, absent the showing of balance of convenience or special circumstances giving priority to the second." *First City Nat'l Bank & Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir. 1989) (quoting *Motion Picture Lab. Technicians Lo. 780 v. McGregor & Werner, Inc.*, 804 F.2d 784, 790 (2d Cir. 1986)). The First-to-File Rule serves to promote judicial administration and conservation of resources (*First City Nat'l Bank*, 878 F.2d at 79), and there is a "strong presumption in favor of the forum of the first-filed suit." *800-Flowers, Inc. v. Intercont'l Florist, Inc.*, 860 F. Supp. 128, 131-132 (S.D.N.Y. 1994).

The Georgia Plaintiffs filed suit in the Superior Court of Muscogee County, Georgia on April 17, 2008, and served ATA with the Summons and Complaint on May 12, 2008. Thus, if ATA wishes to assert causes of action against Rowe Entertainment, Leonard Rowe, and the Wilson Parties, the proper course of action is for ATA to file compulsory counterclaims and cross-claims against those entities, all of which, with the exception of N&D, are parties to the Georgia Action.[7]

Both federal and Georgia state law require that "'[a] pleading . . . state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.' Furthermore, both federal and state courts employ the 'logical relationship' test in determining whether a counterclaim is compulsory." *Ideal Leasing Servs., Inc. v. Whitfield Cty.*, 254 Ga. App. 397 (GA 2002) (internal citations omitted).

---

[7]    ATA can counterclaim against N&D, thus adding them as a party in the Georgia Action. N&D does business in Georgia, and thus personal jurisdiction over N&D would not be an issue.

The logical relationship test is "largely derived from the United States Supreme Court's holding in *Moore v. New York Cotton Exch.*, 270 U.S. 593 . . . (1926) that 'transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Bigley v. Mosser*, 235 Ga. App. 583 (GA 1998). ATA's allegations in the New York Action are clearly compulsory counterclaims in the Georgia Action. The facts surrounding ATA's allegations in the New York Action, specifically the circumstances under which the Wilson Parties invested in the Concert Series and the extent to which they were partners with Mr. Rowe, are the same operative facts to be litigated in the Georgia Action.

In *J. Lyons & Co. Ltd. v. Republic of Tea, Inc.*, 892 F. Supp. 486 (S.D.N.Y. 1995), Plaintiffs, two tea companies, sued defendants, three tea companies, in the Southern District of New York for trademark violations. *Id.* at 487. The defendants, however, had previously each individually filed suit filed in the Northern District of California, in New Jersey, and in Massachusetts, respectively, seeking declaratory judgments that they were not violating plaintiffs' trademarks. *Id.* at 488. The Court found that plaintiffs' claims were compulsory counterclaims in the three declaratory judgment actions. *Id.* at 490. Thus the issue in *J. Lyons* was "whether this Court should hear claims that are compulsory counterclaims to the first-filed action." *Id.* The Court answered the question in the negative. In light of the weight of the first-to-file rule, "which places a strong presumption in favor of the first-filed suit" (*Id.* 493), and considering the "balance of the circumstances"[8] (*Id.* at 490), the Court dismissed plaintiffs' action in New York, and stated that "[plaintiff] may file its claims as compulsory counterclaims in the respective districts of the first-field actions." *Id.* at 493.

In the instant case, ATA's allegations in the New York Action are clearly compulsory counterclaims in the Georgia Action, and the continuation of this action will almost certainly result in judicial inefficiency and potentially conflicting decisions. If the Wilson Parties file an

---

[8]    The "balance of the circumstances" considered were virtually identical to the 1404(a) analysis discussed *infra* at Section D.

Answer in this action (assuming the instant application is denied in its entirety), they will un-doubtedly assert counterclaims against ATA and cross-claims against Rowe Entertainment and Leonard Rowe, which are substantially similar, if not identical, to the allegations made in the Georgia Action, thus increasing the similarity between the New York Action and the Georgia Action. Moreover, if ATA ultimately asserts counterclaims and/or cross claims in the Georgia Action, the Georgia Action and New York Action will thereafter become almost identical. The existence of two almost identical actions in different forums will undoubtedly result in a waste of judicial resources.

Therefore, given the interests of judicial economy and in light of the fact that the Georgia Action was the first-filed, absent a showing by ATA of special circumstances (which are not pre-sent here), this Court is authorized under the First-to-File Rule to dismiss this action, or *in the alternative* to transfer the instant case to the Middle District of Georgia, the federal district con-taining Muscogee County. *See First City Nat'l Bank*, 878 F.2d at 79-80; *800-Flowers, Inc.*, 860 F. Supp. 128 at 131-32.

**B.    There Are No Special Circumstances Present Here**

The factors that are to be considered in ruling on whether special circumstances exist to allow the second-filed action to proceed are similar to the circumstances considered on a discre-tionary motion to transfer under 28 U.S.C. Section 1404(a). *Nat'l Patent Dev. Corp. v. Am. Hosp. Supply Corp.*, 616 F. Supp. 114, 118-119 (S.D.N.Y. 1984). Among them are (1) conven-ience of the parties; (2) convenience of their witnesses; (3) whether nonparty witnesses are sub-ject to the subpoena power of the court; (4) availability of documentary evidence; (5) relative burdens of expenses on the parties; and (6) degree of interruption with executives' functions in-sofar as their trial testimony is required or desirable. *Id.* at 119. These factors, however, are nei-ther rigid nor exclusive, since section 1404(a) analyses also require examination into the "inter-ests of justice," a term "broad enough to cover the particular circumstances of each case." *Schneider v. Sears*, 265 F. Supp. 257, 263 (S.D.N.Y. 1967). *See also Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (Section 1404(a) determinations are made on an "individualized,

case-by-case consideration of fairness and convenience"); *D.H. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006) ("District courts have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis.")

As shown below, these factors certainly do not dictate that the ATA-Rowe-Wilson dispute be litigated here in the second-filed forum (New York). Rather, these factors, almost the same factors as considered under a 1404(a) analysis (see *infra*), strongly favor a Georgia forum.

### C.    This Case Should Be Dismissed On The Grounds of Forum *Non Conveniens* under Fed. R. Civ. P. 12(b)(3)

The doctrine of *forum non conveniens* has been firmly entrenched in the federal courts since the Supreme Court issued its seminal decision in 1947, *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839 (1947), and expanded on it in 1981, in *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S.Ct. 252 (1981). Under the doctrine, a district court has inherent power to dismiss an action when there is an adequate alternative forum in another jurisdiction and a balancing of private and public interest factors tilts strongly in favor of holding the litigation in the alternative forum. *See id.*; *Alfadda v. Fenn*, 159 F.3d 41, 45 (2d Cir. 1998); *Younis v. Am. Univ. in Cairo*, 30 F. Supp.2d 390, 392 (S.D.N.Y. 1998).

Under the Second Circuit's en banc decision in *Iragorri v. United Techs. Corp.*, 274 F.3d 65 (2d Cir. 2001), a district court performs three levels of inquiry in analyzing a *forum non conveniens* motion. First, the court determines the degree of deference to be given to plaintiffs' choice of forum. Second, it considers whether an adequate alternative forum exists. Third, if an adequate forum exists, it proceeds to balance the private and public interest factors to determine which forum "will be most convenient and will best serve the ends of justice." *Alfadda*, 159 F.3d at 45-46 (citation omitted); *Iragorri*, 274 F.3d at 73-74.

Here, the Wilson Parties more than satisfy their burden with respect to each inquiry in the *forum non conveniens* analysis.

(1)     **Plaintiff's Choice of Forum**

*See supra* at Section II(A).

(2)     **An Adequate Alternative Forum Exists**

The second inquiry of the *forum non conveniens* analysis is quickly solved because there is no question that this dispute can proceed in Georgia as there is already another substantially similar action involving the same parties currently pending in the Superior Court of Muscogee County, Georgia.

(3)     **Private and Public Interests Weigh In Favor of Dismissal**

The next inquiry in the Court's *forum non conveniens* analysis is answered by balancing a series of private and public interest factors. *Gilbert*, 330 U.S. at 508. The private factors include: (i) plaintiff's citizenship or residency; (ii) "ease of access to sources of proof"; (iii) "cost of obtaining attendance of willing[] witnesses"; (iv) "availability of compulsory process"; and (v) other practical considerations making for an "easy, expeditious and inexpensive" trial. *Gilbert*, 330 U.S. at 508; *see also Guidi v. Inter-Cont'l Hotels Corp.*, 224 F.3d 142, 146-47 (2d Cir. 2000). The public factors include: (i) settling of local disputes locally; (ii) having issues of foreign law decided by foreign tribunals; and (iii) avoiding burdening jurors with cases that have no impact on their community. *Gilbert*, 330 U.S. at 508-09; *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73-74 (2d Cir. 1998).

To prevail on a motion to dismiss under the doctrine of *forum non conveniens*, a defendant must prove that the balancing of these factors "tilts strongly in favor of [trial in] the purported alternative forum." *PT United Can*, 138 F.3d at 74; *see also Calgarth Inv., Ltd. v. Bank Saderat Iran*, 1996 WL 204470 (S.D.N.Y. April 26, 1996). In this case, the balance is almost entirely weighted toward trial in Georgia.

Although ATA, the plaintiff in the New York Action, is a resident of New York, <u>none</u> of the other parties to the New York Action are residents of New York; rather they are <u>all</u> residents of Georgia. *See* New York Complaint at ¶¶¶¶ 2, 3, 4 ,5, 6. The likely witnesses in this case will presumably include the other Georgia Plaintiffs who are not parties to the New York Action,

none of whom are residents of New York. Rather, two of the Georgia Plaintiffs are residents of Georgia, and the other six, while neither residents of New York nor Georgia, have already consented to jurisdiction in Georgia, and will therefore already have to travel there for purposes of discovery and trial. *See* Bloom Decl. Exhibit "A", at ¶ 9. Moreover, and as more fully set forth *infra* at Section D(5), the cost of litigating in New York is significantly higher for all individuals involved than the cost of litigating in Georgia. Additionally, it is worth noting that the causes of action alleged in the New York Complaint are issues of state law, and the substantive law of Georgia will have to be applied. Accordingly, from a practical point-of-view, it makes logical sense for the case to be decided by a Georgia court. Additionally, the *forum non conveniens* analysis favors the settling of local disputes locally and avoiding burdening courts with cases that have no impact on their community. As the instant matter must be adjudicated under Georgia law, and because all the issues and events relevant to this matter occurred in Georgia, the community with the greatest interest in this case is clearly Georgia. Based on the *Gilbert* factors, as well as a thorough analysis of the similar, though not identical 1404(a) factors, discussed *infra* in Section D, the Wilson Parties respectfully submit that this case should be dismissed based on *forum non conveniens*.

**D.    *In The Alternative* The Convenience of the Parties and Witnesses Compels This Honorable Court to Transfer This Case to the U.S. District Court for the Middle District of Georgia**

28 U.S.C. § 1404(a), the statute upon which the within request to transfer venue is governed, provides in part -- "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

The traditional factors employed in a section 1404(a) analysis are well-known: (1) the plaintiff's choice of forum; (2) the convenience of witnesses; (3) the location of relevant documents and relative ease of access to sources of proof; (4) the convenience of parties; (5) the locus of operative facts; (6) the ability to compel the attendance of unwilling witnesses; and (7) the

relative means of the parties." *Reinhard v. Dow Chem. Co.*, No. 07 Civ. 3641(RPP) 2007 WL 2324351 (S.D.N.Y. Aug. 13, 2007).   The majority of district courts in this circuit also include two additional factors: (8) a forum's familiarity with governing law and (9) trial efficiency and the interests of justice, based on the totality of the circumstances. *Id.* at *3.   Based on the foregoing factors, this action should be transferred to the United States District Court for the Middle District of Georgia.

      **(1)**    **Plaintiff's Choice of Forum Dictates Transfer**

      See *supra* at section II(A).

      **(2)**    **Convenience of the Witnesses and Parties Dictates Transfer**

      "The convenience of both party and non-party witnesses may be the single most important factor in the analysis of whether one forum is more appropriate that a competing forum." *800-Flowers, Inc.*, 860 F. Supp. at 134.   In the instant action, all the parties with the exception of ATA are residents of Georgia.[9]

      (a)    <u>Convenience of the Parties</u>

      Plaintiff alleges that N&D is a corporation organized under the laws of the State of <u>Georgia</u> and has its principal place of business at 2607 National Woods, Augusta, <u>Georgia</u>, Richmond County, 30904.   *See* New York Complaint, at ¶ 4.   Plaintiff alleges that Rowe Entertainment is a <u>Georgia</u> corporation with its principal place of at 5825 Glenridge Drive, Building 1, Suite 218, Atlanta, Fulton County, <u>Georgia</u>, 30328.   *See id* at ¶ 2.   Plaintiff alleges defendants Neal and Deshanna Wilson are residents of Richmond County, <u>Georgia</u>.   *See id.* at ¶¶ 5, 6.   Plaintiff also alleges that defendant Leonard Rowe is a resident of Muscogee County, <u>Georgia</u>.   *See id.* at ¶ 3.

      Of all the parties to the instant action, *only* ATA is <u>not</u> a resident of Georgia.   However, ATA has transacted business in the state of Georgia directly and through the use of Mr. Rowe, acting as its apparent agent.   *See* Bloom Decl. Exhibit "A", at ¶ 2.   Accordingly, this factor favors litigating the instant dispute in Georgia.

---

[9]    Mr. Seitz, the principal of ATA, regularly conducts business within Georgia.

(b)    Convenience of the Parties' Witnesses

Although none of the parties to the instant dispute have yet identified their trial witnesses, it stands to reason that based on the facts surrounding this case and the similar related case currently pending in the Superior Court of Muscogee County, that the Georgia Plaintiffs who are not parties to the instant action will likely be key witnesses in the instant action. Two of the eight Georgia Plaintiffs, who are not parties to the instant action, are residents of Muscogee County, Georgia. *See* Bloom Decl. Exhibit "A", at ¶ 8. The other six, while not residents of Georgia, have already consented to personal jurisdiction in Georgia, and thus are already subject to discovery in Georgia. *Id.* at ¶ 9. Accordingly, this factor favors litigating the instant dispute in Georgia.

(3)    **Non-Parties Subject to Subpoena Power**

At worst, this factor is neutral. Neither New York nor Georgia has the ability to serve process on out-of-state witnesses who are not party-affiliated. Discovery from such witnesses will likely require issuing deposition and document subpoenas from district courts in the various districts in which such witnesses are located. Moreover, to the extent that both the New York action and the Georgia Action are in their infancy, it is as yet unknown what non-party witnesses will be necessary to the adjudication of these actions. The location of the documents and the witnesses is a key to this factor. The majority of the documents (held by non-parties) are located in Georgia (and not in New York).

(4)    **Availability of Documentary Evidence**

The contracts at issue in this litigation, as between ATA and the Wilson Parties, were negotiated and executed in Georgia. *See* Wilson Decl. at ¶ 18. Upon information and belief, all documents that were signed by and between ATA and the Wilson Parties were similarly executed in Georgia. *Id.* at ¶¶ 14, 18. Meetings which took place between the Wilsons and Mr. Rowe, acting on his own behalf and on behalf of ATA, occurred at the Wilson's residence in Georgia. *Id.* at ¶ 18. To the extent that certain arguably relevant transactions occurred outside the State of Georgia, such transactions took place in a number of jurisdictions throughout the

country.[10]   This factor does not dictate allowing this matter to be litigated in New York, but rather leans toward adjudication in Georgia.

### (5)    Relative Burden of Expense to the Parties

New York is a significantly more expensive venue in which to litigate than Georgia.  Although hotels, restaurants and court reporters are more expensive in New York, the primary factor driving the cost disparity is the hourly billing rate of the attorneys.  The rates charged by attorneys in New York are substantially higher than those charged by attorneys in Georgia.  This factor strongly favors transfer of this litigation to the United States District Court in and for the Middle District of Georgia.

### (6)    Degree of Interruption

In the context of this case, this factor is subsumed in the convenience of parties/convenience of witnesses discussions above.

### E.    Judicial Economy Dictates That This Action Be Transferred To The Middle District Of Georgia

The "interests of justice" portion of section 1404(a) is a term "broad enough to cover the particular circumstances of each case."   *Schneider v. Sears*, 265 F. Supp. 257, 263 (S.D.N.Y. 1967).  *See also Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (Section 1404(a) determinations are made on an "individualized, case-by-case consideration of fairness and convenience"); *D.H. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006) ("District courts have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis.").

This case presents a clear situation where the interests of justice and judicial economy dictate transfer.  In short, the New York Action and Georgia Action involve substantially the same parties, are premised upon the same nuclei of operative facts, almost all of which occurred

---

[10]    The Concert Series involved performances in no fewer than fifteen (15) states, including Georgia, Maryland, Missouri, Indiana, Texas, Florida, California, Ohio, Minnesota, Virginia, North Carolina, Alabama, Pennsylvania, South Carolina, and Kentucky, and also in the District of Columbia.

in Georgia, will likely require substantially the same witnesses, and will involve substantially the same documents. If this case is neither dismissed nor transferred to Georgia, both this Court and the Superior Court of Muscogee County will be litigating substantially similar cases, leading to the duplication of efforts, a waste of (judicial and the parties') resources, and potentially inconsistent results. On the other hand, if this action is transferred to the Middle District of Georgia (the Federal District encompassing Muscogee County) there is the potential for the two actions to be consolidated, either by removal of the state action to federal court or remand of the federal action to state court, or by consent of the parties.[11]

*U.S. Banknote Corp. v. E. Bickel & Co. GmbH*, 1993 WL 8165 (S.D.N.Y. Jan. 5, 1993), a case with similar facts and issues decided by this Court, offers some guidance on these issues. In *U.S. Banknote*, the defendants in New York had filed a similar action in Massachusetts four (4) days prior to the plaintiff's filing of the New York action. The New York defendants moved this court for a stay pending determination of the Massachusetts action, or in the alternative, an order transferring the action from the Southern District of New York to Western District of Massachusetts, based upon the allegation that the two cases were almost identical.

This Court instead conducted a review balancing the 1404(a) facts, and recognized that the interest of justice required the transfer of a case from this District to Massachusetts where a parallel action was pending. *Id.* (finding that "[c]onsiderations of trial efficiency tip the balance towards transfer to Massachusetts. A parallel action, arising out of the same transaction or series of transactions, is currently pending in the Western District of Massachusetts. . . .Transfer of this action to Massachusetts would permit consolidation of the two actions and thereby promote the efficient use of judicial resources."). *Id.* at *4. Thus, in *U.S. Banknote Corp.*, this Court granted the motion to transfer to Massachusetts, even though it acknowledged that the Massachusetts ac-

---

[11]     Because there is no <u>guarantee</u> that transferring this case to the United States District Court for the Middle District of Georgia will result in consolidation of the case with the Georgia State Action, the Wilson Parties respectfully submit that it is preferable for this case to be dismissed rather than transferred, which will in no way hinder ATA's right to file counterclaims against the Wilson Parties in the Georgia State Court Action.

tion, though related to the New York action, was not identical, in terms of the parties or certain claims. *Id.* at * 2.

*National Union Fire Ins. v. Turtur*, 743 F. Supp. 260 (S.D.N.Y. 1990) also shares a number of factual and procedural similarities to the case at hand. In *National*, the Plaintiff, an issuer of financial guarantee bonds, filed multiple actions against Defendants in New York. *Id.* at 261. The New York Defendants subsequently filed an action in a Texas state court (which was subsequently removed to the federal court in Texas) against the plaintiff (as well as other parties) claiming tortuous conduct with regard to the underlying investment transactions. The defendants then moved to transfer venue from New York to the District Court in Texas.

This Court ordered the New York Action transferred to Texas under 28 U.S.C. § 1404(a), stating that, "[t]he presence of related litigation in the transferee forum weighs heavily in favor of transfer, since litigation of related claims in the same tribunal results in 'more efficient conduct of pretrial discovery, saves witnesses time and money in both trial and pretrial proceedings, and avoids duplicative litigation and inconsistent results, thereby eliminating unnecessary expense to the parties while at the same time serving the public interest.' . . . Accordingly, 'as a general proposition, cases should be transferred to the district where related actions are pending.'" *Id.* (internal citations omitted).

The transfer of an action to a district where a related case is pending "enables more efficient conduct of pretrial discovery, saves witnesses time and money in both trial and pretrial proceedings ... thereby eliminating unnecessary expense to the parties while at the same time serving the public interest." *Levitt v. Maryland Deposit Ins. Fund Corp.*, 643 F. Supp. 1485, 1493 (E.D.N.Y. 1986). The presence of the Georgia Action dictates transfer of this action to the United States District Court for the Middle District of Georgia.

Here, like the cases cited above and herein, the interests of justice and the interests of judicial economy weigh heavily in favor of transfer of this action to Georgia. The Wilson Parties will be unable to properly defend the New York Action without bringing counterclaims against ATA, and cross-claims against Rowe Entertainment and Leonard Rowe, that arise from the same

set of facts as the Complaint in the First-Filed Action. Upon the filing of these Counterclaims, the Georgia Action and New York Action will be substantially identical. Even more so if ATA files counterclaims against the Wilson Parties and cross-claims against Rowe Entertainment and Leonard Rowe, in the Georgia Action.

## CONCLUSION

For the foregoing reasons, the Wilson Parties respectfully request that this Honorable Court dismiss the within action as to them pursuant to Fed.R.Civ.P. Rule 12(b)(2), 12(b)(3) and pursuant to the First-to-File Doctrine. *In the alternative*, the Wilson Parties respectfully request that the within action be transferred to the United States District Court for the Middle District of Georgia pursuant to 28 U.S.C. § 1404(a) for the convenience of the parties and the witnesses and in the interest of justice.

Dated: New York, New York
      May 28, 2008

Respectfully submitted,

**AKERMAN SENTERFITT LLP**

By: _____
      Donald N. David (DD 5222)
      Brian A. Bloom  (BB 5722)

335 Madison Avenue, Suite 2600
New York, New York 10017
Telephone: (212) 880-3856

*Attorneys for the Wilson Parties*

# COMPENDIUM OF
# UNREPORTED CASES

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 204470 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1996 WL 204470 (S.D.N.Y.))

**H**Calgarth Investments, Ltd. v. Bank Saderat Iran
S.D.N.Y.,1996.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
CALGARTH INVESTMENTS, LTD., Plaintiff,
v.
BANK SADERAT IRAN and Bank Saderat Iran,
New York Agency, Defendants.
No. 95 Civ. 5332 (MBM).

April 26, 1996.

C. Warren Trainor, Ehmann, Van Denbergh &
Trainor, Philadelphia, Pennsylvania, Myron D.
Cohen, Joseph J. Saltarelli, Hunton & Williams, New
York City, for Plaintiff.
Paul Saqqal, New York City, for Defendants.

OPINION AND ORDER

MUKASEY, District Judge.
*1 Calgarth Investments Ltd., an Irish corporation,
has sued Bank Saderat Iran ("BSI"), the state bank
of the Islamic Republic of Iran, and its New York
branch ("BSI-NY") for failure to honor eight
documentary letters of credit ("L/C's"). Defendants
have moved to dismiss the complaint on the grounds
of sovereign immunity and forum non conveniens.
For the reasons that follow, the motion is granted on
the ground of forum non conveniens, and the
complaint is dismissed.

I.

Between May and October 1992, several Iranian
firms that are not parties to this action purchased
assorted machinery from Strojimport Foreign Trade
Co. ("Stroji"), a corporation organized under the laws
of the former Czechoslovakia and operating
principally in and near Prague.[FN1](Pl. Mem. Ex. A) In
payment for the goods, the Iranian parties directed
defendant BSI to issue a total of eight L/C's, with an
aggregate face value of $ 612,679.03, payable to
Stroji. (Bahamie Aff. Ex. A; Compl. ¶¶ 8-15) BSI
issued the first of the eight L/C's on December 1,
1992, and the last on October 31, 1993. (Compl. ¶¶
8-15)

All eight L/C's were denominated in United States
dollars and were payable in Prague at the counters of
Ceskoslovenska Obchodni Bank, A.S. ("CSOB"), the
"advising and negotiating" bank for the instruments.
(Bahamie Aff. Ex. A) CSOB is a bank organized
under the laws of the former Czechoslovakia that
operates principally in Prague. (Compl. ¶ 19) Each
L/C bears a notation directing CSOB, upon paying
the beneficiary, to obtain reimbursement from BSI's
"New York Agency," BSI-NY. (Bahamie Aff. Ex. A)

On October 17, 1994, in return for an undisclosed
sum, Stroji assigned its rights to payment under the
L/C's to plaintiff Calgarth, an Irish corporation
headquartered in London, England. (Id. Ex. H;
Compl. ¶ 1) The assignment agreement provided that
its validity and terms were to be judged according to
the Obligations Law of Switzerland. (Pl. Mem. Ex. H
¶ 4) In addition, the parties to the assignment agreed
to submit to the "exclusive jurisdiction" of the
International Arbitrations Court of the Chamber of
Commerce in Zurich, Switzerland. (Id.) After the
agreement was executed, the parties informed BSI,
BSI-NY, and CSOB by letter that all of Stroji's rights
under the L/C's had been transferred to Calgarth. (Id.
Ex. F)

In late October 1994, Calgarth tried to sell the L/C's
back to BSI at a discount. (Id. Ex G, Ettefagh Aff. ¶
8) BSI initially offered to purchase the L/C's, but
withdrew its offer when it learned that six of the eight
instruments were subject to an international
agreement rescheduling debts between Iran and the
Czech Republic. (Pl. Mem. Ex. L)

On October 24, 1994, by telex transmission, BSI-NY
asked CSOB to confirm that all of Stroji's rights
under the L/C's had been assigned validly to
Calgarth. (Bahamie Aff. Ex. D) CSOB consulted
Stroji and responded that the assignment was not yet
effective because Calgarth had not fulfilled the
assignment's conditions precedent. (Id.) Stroji later
contacted BSI directly and informed the bank that the
assignment to Calgarth was "out of validity" as a
result of Calgarth's failure to perform its contractual
obligations. (Pl. Mem. Ex. M, Rider Aff. ¶ 2.11)

*2 Prior to May 1995, Calgarth made numerous
requests to BSI-NY for payment under the
L/C's.[FN2](Compl. ¶ 26) Following the instructions of
CSOB and Stroji, BSI refused to make any payments
to Calgarth. (Bahamie Aff. Ex. D; Pl. Mem. Ex. M.,
Rider Aff. ¶¶ 2.13-2.16) Sometime in early May

Not Reported in F.Supp.                                                          Page 2
Not Reported in F.Supp., 1996 WL 204470 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1996 WL 204470 (S.D.N.Y.))**

1995, much to the chagrin of Calgarth, CSOB paid Stroji the proceeds due under the L/C's, and CSOB obtained reimbursement from BSI through BSI-NY. (Bahamie Aff. Ex. E) CSOB reserved the right to demand repayment from Stroji in the event that BSI was liable to Calgarth for the proceeds of the L/C's. (*Id.*) BSI-NY executed a single wire transfer in connection with that transaction: BSI-NY transferred the sum owed by BSI on the L/C's to its correspondent bank, the Bank of New York. The Bank of New York transferred the funds to CSOB's correspondent bank in New York, Chase Manhattan Bank; Chase then wired the funds to CSOB in Prague. (Bahamie Aff. ¶ 24)

Calgarth first sought legal relief in England. On May 30, 1995, acting pursuant to § 123 of the United Kingdom's Insolvency Act of 1986, Calgarth served a "notice of demand" on BSI's London branch. (Pl. Mem. Ex. G, Ettefagh Aff. ¶ 16) A "notice of demand" is simply a written demand to a company for payment of a debt in excess of £ 750. (Bercow Aff. ¶ 3) Under English law, if the company fails to pay the sum demanded, it may be deemed legally insolvent with the result that creditors may file a petition for the winding up of the company. (*Id.*)

Upon receipt of the notice, BSI petitioned England's High Court of Justice, Companies Court, Chancery Division, for an order restraining Calgarth from filing a petition for the winding up of BSI. (Pl. Mem. Ex. M) In a memorandum in support of its petition, BSI's solicitor asserted, *inter alia*, that London was an inconvenient forum for the resolution of the dispute. (*Id.*) In an order dated June 16, 1995, Mr. Justice Rattee of that Court granted the requested injunction, effective June 22, 1995, but did not issue an opinion explaining the reasons for the order. (Pl. Mem. Ex. O) In a subsequent order dated June 22, 1995, Mr. Justice Knox of the same Court directed Calgarth to pay BSI attorneys' fees incurred in connection with the petition. (*Id.*) Calgarth informs this court that it has voluntarily stayed further action in London pending resolution of the present action. (*Id.* Ex. G, Ettefagh Aff. ¶ 17)

Calgarth filed this lawsuit on July 17, 1995. BSI moves to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b) on the grounds of foreign sovereign immunity and forum non conveniens.

II.

Subject matter jurisdiction here is premised on § 1330(a) of Title 28, which provides:

The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity *either* under sections 1605-1607 of this title *or* under any applicable international agreement.

*328 U.S.C. § 1330(a) (1988) (emphasis added). BSI is a "foreign state" for purposes of that provision. *See*28 U.S.C. § 1603(a) (1988) ( "foreign state" includes any "agency or instrumentality of a foreign state"); Def. Mem. at 3. Under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et seq., foreign states and their agencies generally are immune from the jurisdiction of United States courts unless (1) one of the exceptions to immunity listed in the FSIA applies to the claims asserted, or (2) immunity has been waived pursuant to "existing international agreements to which the United States [was] a party at the time of enactment of [the FSIA]."28 U.S.C. § 1604 (1988).

BSI strenuously presses the argument that the FSIA's "commercial activity" exception, 28 U.S.C. § 1605(a)(2), does not apply here. But BSI's energies are largely wasted because Calgarth relies primarily on the second alternative route to subject matter jurisdiction listed above, waiver of immunity under an international agreement.

In 1955, over 20 years before the enactment of the FSIA, the United States and Iran signed the Treaty of Amity, Economic Relations, and Consular Rights, which took effect on June 15, 1957. Article XI, ¶ 4 of that Treaty provides:

No enterprise of either High Contracting Party, including corporations, associations, and government agencies and instrumentalities, *which is publicly owned or controlled* shall, if it engages in commercial, industrial, shipping, or other business activities within the territories of the other High Contracting Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit,

execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.

(Pl. Mem. Ex. B) (emphasis added) Although the signatories have not always lived up to the obligations imposed by the document,[FN3] the United States State Department takes the position that the Treaty still is "in full force and effect and [has] not been terminated by either party ...." (Pl. Mem. Ex. C, Trainor Aff. ¶ 3) BSI does not claim otherwise.

The application of the Treaty is relatively simple here. The quoted provision waives the sovereign immunity of government agencies of either country that engage in commercial activities within the territory of the other country. The waiver is not restricted to lawsuits arising out of activities conducted within territories controlled by the other government. BSI admits that it is fully owned and controlled by the government of the Islamic Republic of Iran.[FN4] (Saqqal Aff., Nov. 28, 1995, ¶¶ 5-6) BSI also admits that it conducts commercial banking activity in this country and that it is licensed to do business in New York. (Bahamie Aff. ¶ 4) Because the conditions of the waiver provision are satisfied, sovereign immunity does not bar the present lawsuit.

BSI agrees that the analysis is simple, but reaches the opposite conclusion. BSI correctly observes that the 1955 Treaty waives sovereign immunity for government agencies only if the agencies are "publicly owned or controlled." BSI contends that it is not subject to the blanket waiver because it is not "publicly owned or controlled." BSI reads the phrase "publicly owned or controlled" to mean "owned or controlled by individual members of the private public."(Saqqal Aff., Nov. 28, 1995, ¶¶ 4-7)

*4 The phrase "public ownership" is subject to two practically opposite connotations. When securities brokers, for example, describe a corporation as publicly owned, they generally mean that the shares of the corporation are traded on a national stock exchange and widely held by members of the investing public. That usage is common in commercial and financial discourse, although it is linguistically peculiar in that "publicly owned" in that context is synonymous with "privately owned." In contrast, when Karl Marx advocated public ownership of the means of production, he meant

ownership by the government. *See* Karl Marx & Friedrich Engels, *Communist Manifesto* 30 (Friedrich Engels ed., Int'l Publishers 1976) (1848). That connotation of public ownership also is common. For example, a public park is a government-owned and maintained park; public schools are institutions owned and operated by the government; and "public television" was so-named because the affiliated stations until recently relied on government funding.

Because the concept of "public ownership," standing alone and in the abstract, is ambiguous, it is helpful to look to context in order to determine which connotation was intended in the 1955 Treaty. *See generally Gustafson v. Alloyd Co., Inc.*, 115 S. Ct. 1061, 1069 (1995) (applying doctrine of *noscitur a sociis*, which counsels that "a word is known by the company it keeps").

The language of Article XI, ¶ 4 leaves no doubt that "publicly owned or controlled" was used as shorthand for "owned or controlled by the government" of one of the treaty signatories. Paragraph 4 covers any "enterprise of either High Contracting Party," including any "government agenc[y]." The "High Contracting Parties" of the Treaty were the governments of the United States and Iran. The disputed phrase "publicly owned or controlled" modifies the noun phrase "enterprise of either High Contracting Party."Understanding "publicly owned or controlled" to mean "owned by the government" is consistent with the reference to government agencies and the qualification of "enterprise" with the description "of either High Contracting Party." Concededly, the phrase is somewhat redundant, given that an enterprise "of either High Contracting Party" -- that is, of either signatory government -- is, by definition, a government-owned enterprise. But BSI's interpretation would completely eviscerate ¶ 4 by limiting its coverage to the oxymoronic class of "privately owned government enterprises." Because BSI's interpretation produces an absurd consequence, it cannot have been intended by the parties and it is rejected.

BSI implicitly suggests that ¶ 4 might be read to apply only to private enterprises, but that interpretation produces yet more absurdity. Because the provision is part of an international treaty between two sovereign states, ¶ 4 speaks to the

{NY032209;1}© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 4
Not Reported in F.Supp., 1996 WL 204470 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1996 WL 204470 (S.D.N.Y.))**

doctrine of sovereign immunity. It would be pointless to waive sovereign immunity on behalf of private enterprises, because private enterprises are not sovereigns. Moreover, the last phrase of ¶ 4, which states that enterprises rendered suable by the provision are subject to suit to the same extent as "privately owned and controlled enterprises," makes no sense if BSI's reading of the Treaty is correct. Properly read, ¶ 4 puts "publicly owned" commercial enterprises on equal footing with private entities, anticipating § 1605(a)(2) of the FSIA, which later codified a general "commercial activity" exception to foreign sovereign immunity. BSI's reading of the provision, in contrast, reduces ¶ 4 to the tautology that privately-owned enterprises shall be subject to suit on the same terms as privately-owned enterprises.

*5 Because BSI is subject to suit on the basis of consent under an international agreement, this action is within the subject matter jurisdiction conferred by 28 U.S.C. § 1330. There is no need to consider the applicability of the FSIA's commercial activity exception.

### III.

Even though this court has the power under Article III and Title 28 to decide this case, the court may dismiss the action under the doctrine of forum non conveniens if resolution of the controversy in another country appears more convenient and would better serve the interests of justice. *R. Maganlal & Co. v. M.G. Chemical Co.,* 942 F.2d 164, 167 (2d Cir. 1991). That determination is committed to the sound discretion of the court. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257 (1981).

On a forum non conveniens motion, ordinarily there is a strong presumption in favor of the plaintiff's choice of forum. *Id.* at 255-56. However, courts give substantially less deference to the forum choice of a foreign plaintiff that has brought suit in this country, because it is less reasonable to assume that the foreign plaintiff's choice of a United States forum was prompted by considerations of convenience. *Id.* To prevail on a forum non conveniens motion, the defendant must demonstrate that an adequate alternative forum is available and that "the balance of conveniences tilts strongly in favor of trial in the foreign forum." *Maganlal,* 942 F.2d at 167. In

assessing the "balance of conveniences," the court must consider the private interests of the litigants as well as the public interests of the different candidate fora. *Id.* Private interest factors include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; ... and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508 (1947). Public interest factors include the court's docket congestion, "the local interest in having localized controversies decided at home," and the court's familiarity with the applicable substantive law. *Id.*

### A. Alternative Fora

The initial inquiry in forum non conveniens analysis is whether an alternative forum is available. Generally, an alternative forum is available if the defendant is subject to service of process in another jurisdiction. In rare circumstances, a forum that has jurisdiction over the parties may be deemed inadequate if the only remedies available there are "clearly unsatisfactory," for example because the jurisdiction does not permit litigation of the subject matter of the dispute. *Piper,* 454 U.S. at 254 n.22; *Nippon Fire & Marine Ins. Co. v. M.V. Egasco Star,* 899 F. Supp. 164, 167 (S.D.N.Y. 1995), *recons. denied,* 1996 WL 74745 (S.D.N.Y. Feb. 21, 1996).

Any of four jurisdictions might provide an alternative forum here. First, the Czech Republic would be a logical forum choice, because the nominal beneficiary of the L/C's (Stroji) and the negotiating bank (CSOB) are based in Prague. It is not clear whether BSI may be sued there. BSI coyly asserts that there is "no proof that all parties are not amenable to service in the Czech Republic" without admitting or consenting to jurisdiction there. (Def. Rep. Mem. at 7) BSI's relationship with CSOB, and BSI's issuance of L/C's to Czech beneficiaries, suggest that BSI has substantial ties to the Czech Republic. Second, this dispute might be resolved in England, where Calgarth is headquartered. BSI has a branch office in London and is subject to service of process there. As noted above, England's High Court of Justice, Companies Court, Chancery Division already has addressed the current dispute in the context of Calgarth's statutory notice of demand and BSI's petition for an injunction. Third, Calgarth might

Not Reported in F.Supp.                                                                                    Page 5
Not Reported in F.Supp., 1996 WL 204470 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1996 WL 204470 (S.D.N.Y.))**

sue BSI in Iran. Presumably, BSI is subject to suit in its home country, although it is not clear what remedies might be available there. Fourth, Switzerland might be a desirable forum, because the disputed assignment, upon which Calgarth's rights vis-a-vis the other parties turn, is governed by Swiss law.

*6 There has been no suggestion that any of these jurisdictions offer only "clearly unsatisfactory" remedies, but that may be only because neither party has offered a detailed analysis of the relative merits of these four fora.

B. *Private Interest Factors*

The "private interest" considerations relevant here uniformly weigh in favor of resolution of this dispute elsewhere. The nonparty witnesses whose testimony would be necessary or helpful at trial all reside in the Eastern Hemisphere. The officers and employees of Stroji, the beneficiary of the L/C's and the party that ultimately received the proceeds Calgarth seeks to recover, reside in the Czech Republic. The officers and employees of CSOB, the bank that honored the L/C's in favor of Stroji and expressly refused to recognize the disputed assignment, also reside in the Czech Republic. It does not appear that any of these individuals would be subject to compulsory process in the United States.

Similarly, nearly all of the Calgarth and BSI employees who might be called as witnesses at trial reside abroad. Calgarth's officers reside in London and Dublin. The BSI officials responsible for issuing the L/C's reside in Teheran. Concededly, the few employees of BSI-NY involved in the dispute reside in the Southern District of New York. But their testimony would do little to illuminate the assignment that is the centerpiece of the controversy, because BSI-NY performed only a minor ministerial role in the transactions at issue.

To the extent documentary evidence will be necessary at trial, it too will be drawn primarily from Prague, London, and Teheran.

It may be that neither English, Iranian, nor Swiss courts could assert personal jurisdiction over, and secure the attendance of witnesses from, Stroji and CSOB. But this court also suffers from that

limitation, so the private interest factors still weigh in favor of trial in the Eastern Hemisphere and against trial here. Trial in England, Iran, or Switzerland almost certainly would require less travel, less expense, and less waste of time than trial in a jurisdiction separated by an ocean from the parties and witnesses.

C. *Public Interest Factors*

Public interest considerations also counsel against the litigation of this action in New York, because little meaningful activity occurred here, and because it is difficult to conceive of any interest New York and the United States might hold in the outcome of this dispute.

This is a suit by an Irish plaintiff as assignee of a Czech beneficiary of L/C's that were issued by an Iranian bank. The rights of the parties vis-a-vis each other and against the non-party players in the transactions under scrutiny will turn on the validity of an assignment governed by Swiss law. If and when the parties to the assignment come to litigate its validity and effect, they will do so in the International Arbitrations Court in Zurich. The only link to this country arises because the relatively stable United States dollar is a desirable currency for the denomination of international debts, even in transactions involving no Americans. Because BSI had to reimburse CSOB for its payment on the L/C's in United States dollars, BSI drew on its dollar denominated accounts, which happened to be maintained at its New York branch. But debits and credits at New York bank accounts, without more, do not give New York or the United States an interest in transactions that otherwise are entirely foreign.

*7 The L/C's at issue here are governed by an internationally standardized set of rules, the Uniform Customs and Practice for Documentary Letters of Credit ("UCP"). (Pl. Mem. at 2; Def. Mem. at 16) Thus, neither this court nor a court in any of the four alternative fora would have a significant advantage in familiarity with the applicable substantive law. However, the parties' competing rights ultimately will turn on the validity and effect of the Calgarth-Stroji assignment agreement, which is governed by Swiss law. Although the agreement's provision designating the International Arbitrations Court as the forum for resolution of disputes between Calgarth and Stroji is

Not Reported in F.Supp.                                                                                    Page 6
Not Reported in F.Supp., 1996 WL 204470 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1996 WL 204470 (S.D.N.Y.))**

not binding on BSI, the choice of law clause in the contract presumably would be given effect even in an action against BSI. Thus, a Swiss court would be most familiar with the ultimately controlling substantive law here.

In addition, it bears noting that many of the documents identified by Calgarth as important to the resolution of this dispute and submitted as exhibits to Calgarth's Memorandum of Law are in the Czech language. (Pl. Mem. Ex. A) A Czech court would be best equipped to figure out what those documents mean. *Cf. Nationsbank of Florida v. Banco Exterior de Espana, 867 F. Supp. 167, 171-72 (S.D.N.Y. 1994)* (finding that Spain was not a more convenient forum, in part because prosecution of the action there would require translation of most of the relevant documents into Spanish).

3

In sum, this dispute has only a minimal link to this country. This lawsuit arises from events occurring primarily in the Czech Republic. The important characters in the story reside in the Czech Republic, Iran, and England, far from the United States. The law that will determine the competing rights of Calgarth and BSI -- as well as the other entities that are not, but perhaps should be, parties to any lawsuit addressing the issues raised in plaintiff's complaint -- is the Obligations Law of Switzerland. The court is unable to identify any interest this jurisdiction holds in the present controversy, other than that a trial here would generate revenue for the New York hotels and restaurants that would host inconvenienced witnesses forced to travel here from England, Iran, and the Czech Republic. But that interest is not a public interest in the "outcome of the litigation."

The Czech Republic appears to be the only forum with power over all of the parties to the L/C transactions. For that reason and the other reasons stated above, the Czech Republic seems to be the most convenient forum. Switzerland and England are slightly less advantageous candidate fora for the reasons articulated above, but either place would be vastly more convenient than New York. New York arguably is no less convenient than Iran, as between inferior alternatives to any European forum, but this proves at best only that New York finishes fourth in a five-forum race.

3

For the reasons stated above, the motion to dismiss is granted on the ground of forum non conveniens. The complaint is dismissed.

**\*8 SO ORDERED.**

> FN1. On January 1, 1993, Czechoslovakia split into two independent nations, the Czech Republic and Slovakia. *See* Stephen Engelberg, *Czechoslovakia Breaks in Two, to Wide Regret*, N.Y. Times, Jan. 1, 1993, at A1. Prague is the capital of the Czech Republic.

> FN2. It is not clear why Calgarth sought direct payment from BSI-NY. The L/C's state that they are payable at the counters of CSOB in Prague. The L/C's give CSOB the right to seek reimbursement from BSI-NY, but do not purport to give the beneficiary (or its assignee) any direct rights against BSI-NY.

> FN3. For example, the Iranian government's acquiescence in the 1979 seizure of American embassy employees in Teheran arguably was in violation of Article XIII, ¶ 1 of the Treaty, which guarantees consular employees of either government "the privileges and immunities accorded to officers and employees of their rank or status by general international usage" while within territory controlled by the other government.

> FN4. Before 1979, BSI was privately owned. The bank was nationalized in June 1979. (Sabet Aff. ¶ 6; Saqqal Aff. ¶ 5)

S.D.N.Y.,1996.
Calgarth Investments. Ltd. v. Bank Saderat Iran
Not Reported in F.Supp., 1996 WL 204470 (S.D.N.Y.)

END OF DOCUMENT



Slip Copy                                                                                          Page 1
Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
**(Cite as: 2007 WL 2324351 (S.D.N.Y.))**

C Reinhard v. Dow Chemical Co.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
J. Pedro REINHARD, Plaintiff,
v.
The DOW CHEMICAL CO., and Andrew N. Liveris,
Defendants.
**No. 07 Civ. 3641(RPP).**

Aug. 13, 2007.

Kramer, Levin, Naftalis & Frankel LLP, Attn: <u>Gary
P. Naftalis</u>, New York, NY, for Plaintiff, J. Pedro
Reinhard.
Kirkland & Ellis LLP, Attn: <u>David M. Bernick</u>, New
York, NY, for Defendants, Dow Chemical Co., and
Andrew N. Liveris.

**OPINION and ORDER**

ROBERT P. PATTERSON, JR., U.S.D.J.
**\*1** Defendant The Dow Chemical Company ("Dow")
moves to transfer pursuant to <u>28 U.S.C. § 1404(a)</u>.
Defendant Andrew N. Liveris ("Liveris") moves to
dismiss pursuant to <u>Fed. R. Civ. P. 12(b)(3)</u>, to
transfer pursuant to <u>28 U.S.C. § 1406(a)</u>, or in the
alternative, to join Defendant Dow's motion to
transfer under <u>28 U.S.C. § 1404(a)</u>.

For the reasons that follow, Dow's and Liveris'
motions to transfer under <u>§ 1404(a)</u> are granted.
Liveris' motion to dismiss under <u>Fed. R. Civ. P.
12(b)(3)</u> or transfer under <u>§ 1406(a)</u> is denied. The
action is transferred to the Eastern District of
Michigan.

**BACKGROUND**

**A. Factual Background**

**1. The Parties**

Plaintiff, J. Pedro Reinhard ("Reinhard"), was an
employee of Dow for thirty-seven years. Reinhard

became Chief Financial Officer ("CFO") and a
member of the Board of Directors ("the Board") in
1995. Although he retired as CFO and Executive
Vice President in 2005, he remained an employee
director on the Board until his termination in April,
2007. (Compl., dated May 8, 2007, ¶ 14.) Reinhard is
a citizen of Brazil, a lawful permanent resident of the
United States, and is domiciled in Florida. (*Id.* ¶ 9.)

Defendant, The Dow Chemical Company, is a
Delaware corporation that has its principal place of
business in Michigan and engages in continuous
activities in New York. (*Id.* ¶ 10.)Defendant, Liveris,
is the Chairman, CEO, and President of Dow; he is a
citizen of Australia, a lawful permanent resident of
the United States, and is domiciled in Michigan. (*Id.*
¶ 11.)

**2. Rumors about a Dow Acquisition and
Reinhard's Termination**

According to Defendants, rumors about a Dow
acquisition began with a report in the *Financial
Times* on January 18, 2007, which stated that a group
of private equity firms were "working on a break-up
bid for Dow."(Dow Countercl., dated May 29, 2007,
¶ 10 .) On February 25, 2007, the *Sunday Express,* a
United Kingdom newspaper, reported that a group of
"global investors and American private equity giants
were close to making a bid for Dow."(Compl.¶ 22.)
Reports relating to such a bid were also published in
the *Evening Standard* on March 12, 2007. (Dow
Countercl. ¶ 15.) On April 8, 2007, the *Sunday
Express* reported that a group of Middle East
investors and a group of private equity firms were
potentially "days away" from a bid. (*Id.* ¶ 20.)

Dow's response to these early reports rumors was to
make "inquiries with the investment banking and
financial community, to determine whether: (i) there
was a basis for these rumors; and (ii) the source of
these rumors."(*Id.* ¶ 11.)<u>FN1</u>Additionally, Dow had
board meetings to discuss the reports, which were
attended by Reinhard, at its headquarters in Midland,
Michigan on February 14 and March 16, 2007. (*Id.* at
¶¶ 12, 17.)After the second meeting, the company
issued a press release stating that Dow had not had
any discussions about a possible leveraged buyout.

*(See id. ¶ 23.)*

> FN1. Dow "retained [the law firm] Wachtell, Lipton ... to advise the company concerning potential reactions to a takeover bid."(Transcript of Oral Argument, dated August 2, 2007 ("8/2 Tr .") at 13.)

*2 On April 9, 2007, James Dimon ("Dimon") the Chief Executive Officer of J.P. Morgan Chase ("Morgan"),[FN2] is alleged to have told Liveris at a dinner meeting in Michigan that a London affiliate was working on an acquisition of Dow on behalf of Middle East investors. (*Id.* ¶ 24.)Dow contends that on April 10, 2007, Dimon called Liveris and stated that Reinhard and Romeo Kreinberg ("Kreinberg"), another Dow executive, were engaged in discussions about a Dow acquisition. (*Id.* ¶ 25.)[FN3]On the same day, Dow's outside counsel, James Saverese, spoke with Dimon and Liveris on a conference call to confirm the statements Dimon had made to Liveris. (*See* 8/2 Tr. at 14.)

> FN2. Dow refers to its source as the "Bank's CEO," never naming James Dimon. (*See generally* Dow Ans.; Dow Countercl.) Reinhard states, however, that it is "alleged by Mr. Kreinberg in his complaint, and as is undisputed by Dow, the CEO was James Dimon, of Morgan Chase."(Pl.'s Opp'n., dated July 6, 2007 at 4; *see* Affidavit of Duncan Stuart, dated May 29, 2007 ("Stuart Aff.") Ex. C (Kreinberg Compl.) ¶ 2.)

> FN3. Reinhard denies participation in any meetings with respect to takeovers or acquisitions of Dow. (Compl.¶ 35.) He alleges that on July 27, 2006, Dow lowered its earnings estimate for the year, its shares fell by more than ten percent, and "thereafter, rumors began to circulate that Dow might be a target for a buyout or other effort ...." (*Id.* ¶ 21.)

On April 11, 2007, the first day of a previously scheduled board meeting,[FN4] Liveris addressed the allegations about Reinhard's and Kreinberg's alleged third party discussions regarding a bid for Dow. The Board discussed the extent of the Dow employees' involvement, the credibility of the witness, and what steps to take. (Dow Countercl. ¶ 27.) The Board

unanimously decided that the information was credible and that Reinhard and Kreinberg should be terminated. (*Id.* ¶¶ 27-28.)

> FN4. Reinhard was absent from this meeting, having previously informed Liveris that he would not be able to attend for unrelated reasons. (*See* Dow Countercl. ¶ 29.)

At 7:00 AM, on April 12, 2007, prior to the Board meeting scheduled for that day, Liveris met with Reinhard in his office in Midland, Michigan. (Compl.¶ 25.) Also present at this meeting were Charles Kalil (General Counsel to Dow), Paul Stern, Arnold Allemang (a Board member), and Martin Lipton of Wachtell, Lipton. (*See* Dow Countercl. ¶ 28.) At the meeting, Liveris told Reinhard that he had "received information" about Reinhard's participation in discussions about an acquisition of Dow. Liveris informed Reinhard that, based on this information, the company had concluded that Reinhard had engaged in grave misconduct and breaches of his fiduciary duty. (Compl.¶ 25.) Reinhard alleges, and Dow denies, that Liveris offered Reinhard his financial benefits if he resigned immediately. (*Id.* ¶ 25; Dow Ans. ¶ 25.) Reinhard denied breaching his fiduciary duties and refused to resign; Dow terminated Reinhard that day. (Compl.¶ 26.)

**3. Reinhard's Termination Becomes Public**

That same day, Dow issued a press release, in Michigan, which stated that Reinhard and Kreinberg had been terminated because they "engaged in business activity that was highly inappropriate and a clear violation of Dow's Code of Business Conduct."[FN5](*Id.* ¶ 29.)Dow also published on its website "An Open Letter to Our Valued Customers" and mailed a "Supplement to Notice of the Annual Meeting and Proxy Statement,"[FN6] addressing both the alleged actions of Reinhard and his termination. (*Id.* ¶¶ 32, 36.)Reinhard released a statement on April 16, 2007 denying any involvement in a Dow acquisition.(*Id.* ¶ 35.)

> FN5. The press release was also published on Dow's website. (Compl.¶ 31.)

> FN6. The "Supplement to Notice of the Annual Meeting and Proxy Statement" had

Slip Copy                                                                                                    Page 3
Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
(Cite as: 2007 WL 2324351 (S.D.N.Y.))

the following return address: The Dow Chemical Company, c/o The Bank of New York, PO Box 11002, New York, N.Y. 10286-1002. (Compl.¶ 36.)

Reports of Reinhard's and Kreinberg's termination were published in various news sources, including: *Saginaw News, The Wall Street Journal, The New York Times,* and *The Financial Times.*(*Id.* ¶¶ 31, 33.)An article in *The Wall Street Journal* quoted Dow spokesperson, Christopher Huntley, stating that Reinhard's alleged third party discussions were conducted during "multiple meetings in multiple months in multiple locations [and] with a number of different parties."(*Id.* ¶ 33.)

**4. Events Preceding the Instant Action**

**\*3** Dow and Reinhard engaged in ineffective settlement talks for three weeks after Reinhard's termination. (Declaration of Gary P. Naftalis, dated July 5, 2007 ("Naftalis Decl.") ¶¶ 2-3.) After receiving a settlement proposal from Dow on May 7, 2007, Dow and Reinhard agreed to a conference call on May 8, 2007 at 11 a.m. to further discuss the proposal. (*Id.* ¶ 3.) On May 8, 2007, Dow cancelled the conference call and filed suit. (*Id.* ¶ 4.)

On May 8, 2007, at 8:30 a.m., Dow filed an action for breach of contract, breach of fiduciary duty, and declaratory judgment against Reinhard and Kreinberg in the Eastern District of Michigan. Later that day, Reinhard filed this complaint against Dow and Liveris.[FN7](*Id.* ¶ 3.) On the same day, Kreinberg filed his own action in New York State Supreme Court.[FN8]

> FN7. Reinhard alleges that Dow was aware of his preparation for litigation in early May. He also claims that he did not discover that Dow had filed suit against him in Michigan until he had filed the instant action. (Naftalis Decl. ¶¶ 3-4.)

> FN8. Kreinberg's action was subsequently removed to federal court in this district and then transferred to Michigan by Judge Marrero. *See Kreinberg v. Dow Chemical Co.,* 2007 WL 2141391 (S.D.N.Y. July 23, 2007).

**B. Procedural Background**

The May 8, 2007, complaint filed by Reinhard in this district against Defendants Dow and Liveris alleged claims for (1) libel and (2) breach of contract. On May 29, 2007, Dow filed their Answer and Counterclaim, as well as this Motion to Transfer Pursuant to 28 U.S.C. § 1404(a). On June 19, 2007, Liveris filed a Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(3), to Transfer Pursuant to 28 U.S.C. § 1406(a), or in the Alternative to Join Dow's Motion to Transfer under 1404(a). On July 6, 2007, Reinhard filed a Memorandum in Opposition to Dow's Motion to Transfer and Liveris' Motion to Dismiss or Transfer. Defendants submitted a reply memorandum on July 16, 2007 in further support of their motions. Oral arguments were held on August 2, 2007.

**DISCUSSION**

**A. Legal Standard**

Section 1404(a) states that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."28 U.S.C. § 1404(a) (1996). District courts have broad discretion to determine convenience and justice on a case-by-case basis. *D.H. Blair & Co., Inc. v. Gottdiener,* 462 F.3d 95, 106 (2d Cir.2006) (citations omitted). Courts should consider factors of private and public interest. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-509 (1947). The following factors are considered in determining convenience and justice: "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the ability to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties."*D.H. Blair & Co.,* 462 F.3d at 106-107. The majority of district courts in this circuit also include two additional factors: "[ (8) ] a forum's familiarity with governing law ... [and (9) ] trial efficiency and the interests of justice, based on the totality of the circumstances."*Strougo v. Brantley Capital Corp.,* 2007 WL 1683348, at \*5 (S.D.N.Y. June 3, 2007) (citations omitted). The party making the motion to transfer has the burden to show that the transfer is

Slip Copy
Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
**(Cite as: 2007 WL 2324351 (S.D.N.Y.))**

warranted. *D.H. Blair & Co.*, 462 F.3d at 106.

*\*4* After a consideration of all nine factors, the Court finds that Defendants have met their burden of showing by a preponderance of the evidence that this case should be transferred to the Eastern District of Michigan.

**1. Plaintiff's Choice of Forum**

Normally, a court should "give due deference to the plaintiff's choice of forum which should not be disturbed unless the balance of convenience and justice weigh heavily in favor of defendant's forum ...." *Citigroup Inc. v. City Holding Co.*, 97 F.Supp.2d 549, 561 (S.D.N.Y.2000) (internal quotations omitted). However, a plaintiff's choice of forum is given less deference when the forum is "neither the [plaintiff's] home nor the place where the operative facts of the action occurred." *Hall v. South Orange*, 89 F.Supp.2d 488, 494 (S.D.N.Y.2000) (internal quotations omitted).

Although Reinhard chose to bring suit in the Southern District of New York, he is domiciled in Florida, and most of the operative facts took place in Michigan.[FN9] Reinhard's assertion that he "travels to New York at least once a month to attend board meetings ... and to transact other business," (Pl.'s Opp'n at 17), is not persuasive. *See Herbert Ltd. Pushup. v. Elec. Arts, Inc.*, 325 F.Supp.2d 282, 291 (S.D.N.Y.2004) (holding that plaintiff's forum will receive relatively little weight because even though plaintiff alleges that it "conducts all of its business operations" in its chosen forum, it is not plaintiff's home district and the majority of operative facts took place elsewhere).

> FN9. *See infra* § A(5), discussing locus of operative facts.

**2. The Convenience of Witnesses**

The convenience of witnesses weighs in favor of a transfer to Michigan. The convenience of party and non-party witnesses is an important factor: "indeed, certain courts in this district have called it 'probably the single-most important factor in the analysis of whether transfer should be granted.' " *Strougo*, 2007 WL 1683348, at *\*5* (internal citations omitted). The

defendant has the burden of "clearly specify[ing] the key witnesses to be called and must make a general statement of what their testimony will cover." *Peterman v. U.S.*, 2006 WL 2806417, at *\*2* (N.D.N.Y. Sept. 28, 2006) (citing *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir.1978)).

Dow's Assistant General Counsel, Duncan Stuart, listed the following possible witnesses all located in Michigan both defendants, Dow and Liveris; Dow spokesperson, Chris Huntley, the other employee named in the complaint; Dow's public affairs personnel who were involved in releasing statements about Reinhard's termination; Dow's human resources personnel who were involved in Reinhard's compensation plans and the finance and mergers and acquisitions personnel; and Reinhard's assistant who made his international travel plans. (Stuart Aff. ¶¶ 6-12.)

Despite Dow's long list of Michigan witnesses, Reinhard believes that this factor should weigh in favor of maintaining the action in this district because Dimon, "arguably the most important non-party witness [for the libel claim]," and other possible Morgan witnesses reside either in New York or London. (Pl. Opp'n at 13.)[FN10]

> FN10. While Plaintiff's opposition papers refer to "other Morgan witnesses," at oral argument Dow's counsel made the uncontradicted statement that Plaintiff's Rule 26(f) statement listed only Mr. Reinhard, Mr. Kreinberg, Mr. Dimon, and three Dow Employees in Michigan, as the persons known to them to have knowledge of the claims in the Complaint. (*See* 8/2 Tr. at 20.) Furthermore, counsel for Plaintiff, stated at oral argument that the allegedly false statements were "based solely and exclusively on a conversation ... with Mr. Dimon ...." (*Id.* at 39.)

*\*5* At oral argument, however, Dow's counsel, David Bernick, pointed out that although Mr. Dimon had provided information to Dow about the proposed leveraged buyout planned by groups of investors in the United Kingdom and Oman at meetings in the United Kingdom, Dimon was not in attendance at these meetings, nor were the other "Morgan sources," nor was outside counsel, Saverese, who participated

{NY032210;1} © 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in the discussions with Dimon and Liveris. (*See* 8/2 Tr. at 11-17.) Thus, the potential witnesses residing in New York will not be able to testify as to the truth or falsity of the allegedly defamatory statements made by Dow. The witnesses who might have personal knowledge about the statements are located in the U.K. and Oman.

The most the New York witnesses could testify about would be whether the allegedly libelous statements made by Dow and Liveris about Plaintiff were fair and reasonable in light of the information they had provided to Defendants. Thus, their testimony at trial would only be relevant in so far as it might bear on any bad intent or reckless negligence on the part of Defendants, and, even then, only if the statements of Defendants about Plaintiff contradicted the information supplied by Mr. Dimon and the other alleged Morgan witnesses. On the other hand, Plaintiff is also alleging malice on the part of Defendant Liveris based on prior interactions with Plaintiff. (*See* Compl. ¶ 49.) The witnesses to such prior interactions of Defendant Liveris are most likely all employees of Dow residing in Michigan, or members of Dow's board, a number of whom live in Michigan, while only one lives in New York. (*See* 8/2 Tr. at 65.)

Furthermore, the witnesses to Plaintiff's breach of contract claim, other than Plaintiff, would appear to be based solely in Michigan, since the contract was formed and all the acts alleged in the Complaint bearing on its breach occurred in Michigan. (*See* Compl. ¶¶ 53-57.) On balance, the convenience of the witnesses will best be served by a transfer to Michigan.

**3. Location of documents and relative ease of access to sources of proof**

The location of relevant documents and relative ease of access to sources of proof weigh in favor of a transfer to Michigan. Dow's relevant documents are minutes from the Board's meetings involving Reinhard's termination, press release drafts, Reinhard's documents and emails, and the documents and emails of other Dow employees. (Stuart.Aff.¶ 13.) These documents are all located in Michigan. (*Id.*) Because of technological advancements and the ability to electronically send documents to the site of the litigation, the location of hard copies is given

little weight. *See* <u>*Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. LaFarge N. Am. Inc.*, 474 F.Supp.2d 474 (S.D.N.Y.2007)</u>. However, because email discovery is likely and hard drive discovery may be required, this factor favors a transfer to Michigan.

**4. The Convenience of Parties**

The convenience of the parties weighs in favor of Dow's motion to transfer: "[w]here neither party resides in the chosen forum, 'it is only logical that a transfer to the residence of one of them would be more convenient.'" *Dealtime.com v. McNulty*, 123 F.Supp.2d 750, 756 (S.D.N.Y.2000) (quoting *ZPC 2000, Inc. v. SCA Group, Inc.*, 86 F.Supp.2d 274, 279 (S.D.N.Y.2000)). Both defendants, Dow and Liveris, reside in Michigan and Reinhard himself is domiciled in Florida. (Compl.¶¶ 9-11.) Though Reinhard claims that it will be more convenient for him to travel to New York than to Michigan (Pl.'s Opp'n. 17), he must travel regardless of where the case is tried.[FN11] Moreover, though a trip from Florida or New York to Bay City, Michigan, may indeed be inconvenient for parties residing on the East Coast, a trip to New York will be equally inconvenient for those parties residing in Michigan.

> FN11. Plaintiff's counsel, whose offices are located in New York, and who would not have to travel if the action were kept in this district, noted that it took them "14 hours to get home from [a] conference [in Bay City]." (8/2 Tr. at 47.) While the Court empathizes with this inconvenience, it also notes that convenience of counsel is not a factor to be weighed in a motion to transfer.

**5. Locus of operative facts**

\*6 The locus of operative facts weighs in favor of Dow's motion to transfer. The claims of libel and breach of contract are based largely on Reinhard's employment and compensation agreements, Dow's board meetings, Reinhard's termination, and the allegedly defamatory press releases and letters to shareholders issued by Dow. These events all took place in Michigan. (*See* Compl. ¶¶ 24-26, 28-32, 40-42.) The locus of operative facts in a breach of contract case looks at "where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred." *Prudential*

Slip Copy                                                                                                                Page 6
Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
(Cite as: 2007 WL 2324351 (S.D.N.Y.))

*Sec. v. Norcom Dev., Inc.*, 1998 WL 397889, at *4 (S.D.N.Y. July 16, 1998). Reinhard's breach of contract claim is based on multiple contracts and compensation plans, at least one of which was signed by executives in Midland, Michigan. (Compl. ¶ 54; Naftalis Decl. Ex. J.) The Board of Directors and the Dow personnel who interpret and administer the compensation plans, meets in Midland, Michigan. (Dow Countercl. ¶ 35.)

As for the libel claim, Reinhard alleges that he has suffered the greatest harm in New York, since most of the defamatory statements were circulated in New York and because New York is the center of the financial press. (Compl. ¶ 37; Pl.'s Opp'n at 15.) The harm to Reinhard based on the publication of Dow's press release in New York does weigh in favor of a trial in this district, however, it is not a determinative factor when all of the operative facts are considered together. *See Curtis Publ'g Co. v. Birdsong*, 360 F.2d 344, 347 (5th Cir.1966) (holding that in a multi-state publication of libel, it is not enough that the Post was sold in Alabama, as this would create a forum in all other states as well)); *see also Barge v. Daily Journal Corp.*, 1996 WL 434561, at * 4-5 (S.D.N.Y. Aug. 2, 1996) (holding that although allegedly defamatory claims were published in Seattle and the plaintiff was harmed in Seattle, the litigation should be situated in California because that was the location where more operative facts took place). Here, even if the circulation of the allegedly defamatory statement did the most harm to Reinhard in New York, the majority of operative facts still took place in Michigan.

**6. Availability of process to compel the attendance of unwilling witnesses**

The availability of process to compel the attendance of unwilling witnesses is a neutral factor. Important elements for this factor are the inability to compel process over a witness, the availability of alternate forms of testimony, and a showing that the witness would be unwilling to testify. *See Citigroup Inc.*, 97 F.Supp.2d at 561-562 (holding that although it may be preferable to have live testimony in the issue at hand, this factor had little weight because defendants failed to show or suggest an unwillingness of the non-party witness to testify).

As Plaintiff notes, Dimon may be beyond Michigan's subpoena power. (Pl.'s Opp'n at 16.) However, there

has been no suggestion that Mr. Dimon or any other witness would be unwilling to travel to testify.[FN12] Furthermore, "in light of the option of videotaping testimony of witnesses unwilling to travel," *Dealtime.com*, 123 F.Supp.2d at 757 (citations omitted), the witnesses' possible unwillingness to appear in Michigan would not be a determinative factor in this case.

> FN12. At oral argument, neither party indicated knowledge about Mr. Dimon's willingness to travel to Michigan (*See* 8/2 Tr. at 44, 54 .)

**7. Relative means of the parties**

*7 The relative means of the parties weighs against a transfer. If a "disparity exists between the parties, such as an individual suing a large corporation, the relative means of the parties may be considered."*Berman v. Informix Corp.*, 30 F.Supp.2d 653, 659 (S.D.N.Y.1998). However, where "no showing has been made that [a change of forum] would impose an undue hardship on the plaintiff ... this factor weighs neutrally in the overall analysis."*Id.* Reinhard states that litigating in Michigan would "further strain [his] financial resources," (Affidavit of J. Pedro Reinhard, dated July 6, 2007, ¶ 8), but, given the depth of his financial resources, he has not shown that traveling to Michigan for this litigation will be an undue hardship.[FN13]

> FN13. According to a 2006 SEC filing by Dow, Reinhard's annual compensation in 2005, less long term incentives, was over $2 million. (Declaration of Frank Holozubiec, Ex. B (Dow Form 14A) at 4.)

**8. Forum's familiarity with the governing law**

The forum's familiarity with the governing law is a neutral factor in the analysis. It is likely that Delaware law will govern the breach of contract action and breach of fiduciary duty counterclaim because Dow is incorporated in Delaware.

For the libel claim, it is not certain which state's laws will govern.[FN14] Regardless, as noted by Plaintiff's counsel at oral argument, libel laws are similar

Slip Copy                                                                          Page 7
Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
**(Cite as: 2007 WL 2324351 (S.D.N.Y.))**

enough that a judge will be familiar with the governing law no matter which state's statute ends up applying to the claim in this case.[FN15] Therefore, because the breach of contract and breach of fiduciary duty claim is governed by Delaware law, which is foreign to both jurisdictions, and because a judge in either forum should be familiar with the principles of libel law, this factor is neutral.

> FN14. The following are factors to consider in multi-state libel cases: "(1) the state of the plaintiff's domicile; (2) the state of plaintiff's principal activity to which the alleged defamation relates; (3) the state where the plaintiff in fact suffered greatest harm; (4) the state of the publisher's domicile or incorporation; (5) the state where the defendant's main publishing office is located; (6) the state of principal circulation; (8) the state where the libel was first seen; and (9) the law of the forum." *Weinstein v. Friedman,* 1996 WL 137313, *8-9 (S.D.N.Y. Mar. 26, 1996). It is not immediately clear whether Michigan or New York has more connections to the libel claim.

> FN15. (*See* 8/2 Tr. at 42 ("I don't have any reason to believe that the general principles of libel law are any different in Michigan than they are in New York.").)

**9. Trial efficiency and the interests of justice**

Now that both Dow's action and Kreinberg's action are located in the Eastern District of Michigan, efficiency and the interests of justice weigh in favor of transferring this lawsuit to that district. It is logistically practical to have all trial and discovery scheduling issued from one court given that so many of the witnesses and document production will coincide in all three cases.

**B. Liveris' motion to dismiss pursuant to Rule 12(b)(3) or transfer pursuant to § 1406(a) is denied; his motion to transfer pursuant to § 1404(a) is granted.**

Liveris' motion to dismiss for lack of venue under Rule 12(b) (3), and his motion to transfer under § 1406(a) are denied.[FN16] Liveris is a citizen of Australia

and a lawful permanent resident of the United States.[FN17] (Compl. ¶ ; Dow Ans. ¶ 11.) Under § 1391(d), "an alien may be sued in any district." Accordingly, venue is proper in this district or in the Eastern District of Michigan.

> FN16. A motion to dismiss for improper venue is made under Fed.R.Civ.P. 12(b)(3). Section 1406(a) states that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a) (1996).

> FN17. Section 1391(d) applies to all aliens, resident or non-resident. *See Haaretz Daily Newspapers, Ltd. v. Maariv Modiin Pub. Co., Ltd.,* 1999 WL 796163, at *1 (S.D.N.Y. Oct. 6, 1999).

Liveris' Motion to Transfer under § 1404(a) is granted on the same grounds as Dow's motion.

CONCLUSION

For the aforementioned reasons, it is hereby ordered that the Clerk of Court is directed to transfer this action to the Eastern District of Michigan.

IT IS SO ORDERED.

S.D.N.Y.,2007.
Reinhard v. Dow Chemical Co.
Slip Copy, 2007 WL 2324351 (S.D.N.Y.)

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.                                                                   Page 1
Not Reported in F.Supp., 1993 WL 8165 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 8165 (S.D.N.Y.))**

**C**U.S. Banknote Corp. v. E. Bickel & Co. GmbH
S.D.N.Y.,1993.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
UNITED STATES BANKNOTE CORPORATION
and American Bank Note Company, Plaintiffs,
v.
E. BICKEL & CO. GMBH and Bickel USA,
Defendants.
**No. 92 CIV 6431 (RPP).**

Jan. 5, 1993.

Law Office of Charles B. Manuel, Jr. by Charles B.
Manuel, Jr., New York City, for plaintiffs.
Cournoyer & Cournoyer, P.C. by Donald Cournoyer,
Jr., Southbridge, Mass., Albert A. Natoli, New York
City, for defendant Bickel USA.

OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.
**\*1** Plaintiffs bring this action for compensatory and
punitive damages based upon allegations of breach of
contract, breach of warranty, and breach of implied
covenant of good faith and fair dealing arising out of
Plaintiffs' agreement to purchase machinery from
Defendants. Defendant Bickel USA moves for (1)
reinstatement of this Court's previous order of
dismissal, or, alternatively, (2) an order transferring
this action to the United States District Court for the
Western District of Massachusetts, or, alternatively,
(3) a stay of this action pending determination of a
parallel action currently pending in the Western
District of Massachusetts. For the reasons set forth
below, Defendant's motion to transfer this action to
the Western District of Massachusetts is granted.

BACKGROUND

Plaintiff United States Banknote Corporation
("USBN") is a New York corporation having its
principal place of business in New York. Compl. at ¶
2. Plaintiff American Bank Note Company ("ABN"),
a subsidiary of USBN, is a New York corporation
with a principal place of business in Pennsylvania

and offices in New York and California. *Id.* at ¶ 3.

Defendant E. Bickel & Co. GmbH ("Bickel
Germany") is a German company allegedly doing
business in the United States through its sales agent,
Defendant Bickel USA. *Id.* at ¶ 4. Bickel USA is an
organization having a principal place of business in
Wilbraham, Massachusetts, and a mailing address in
East Longmeadow, Massachusetts. Defendant's
Notice of Motion, dated Nov. 17, 1992, ("Notice of
Motion"), Exh. B.

In December 1990, Mr. John M. Shank, President of
Bickel USA, offered ABN an option to purchase a set
of machines manufactured by Bickel USA.
Affidavit of John A. Murphy, dated Oct. 19, 1992,
("Murphy Aff.") at ¶ 2. In January of 1991, ABN
paid the defendants $15,000 to secure the option to
purchase this first set of machines. *Id.* at ¶ 4. ABN
soon exercised its option by ordering the first set of
machines, then ordered a second set of machines. *Id.*
ABN intended to use these machines to punch
perforations in the postage stamps that it
manufactures. *Id.* at ¶ 3.

Plaintiffs allege that Defendants failed to deliver the
machines in a timely manner and made repeated false
assurances that delays would be short term. Affidavit
of Harvey J. Kesner, dated Oct. 19, 1992, ("Kesner
Aff.") at ¶ 5. They also allege that the machines,
when eventually delivered, did not perform as
promised. *Id.* at ¶ 6. Defendant Bickel USA
maintains that it has completely performed its
contract with the plaintiffs and is therefore entitled to
the balance of $425,598 owed to it by the plaintiffs
under the contract. Notice of Motion, Exh. B.

ABN and Bickel USA attempted to negotiate a
settlement to this dispute before taking court action.
The plaintiffs assert that during the course of the
settlement discussions, "ABN informed Bickel that if
some agreement could not be reached, ABN was
prepared to file in New York an already drafted
complaint seeking relief for injuries suffered by ABN
as a result of the delays, defects and subsequent
malfunctions." Kesner Aff. at ¶ 11.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 8165 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1993 WL 8165 (S.D.N.Y.))

**\*2** On August 19, 1992, Bickel USA filed an action arising out of this contract dispute against ABN and USBN in the Western District of Massachusetts. The Complaint in that action alleges breach of contract and unjust enrichment and seeks judgment in the amount of the balance remaining under the contract plus interest. Notice of Motion, Exh. B. The Complaint also states Bickel USA's intent to request an injunction prohibiting the defendants from using the machines during the pendency of the suit, but indicates that "said injunction request [is] to be made formally by separate Motion." *Id.* The summons in the Massachusetts action was issued on September 9, 1992, and ABN was served on September 23, 1992. Kesner Aff. at ¶ 15.

On August 23, 1992, USBN and ABN filed this action in the Southern District of New York. *Id.* at ¶ 12. The summons was issued on the same day, and summons and complaint were served "immediately" upon Bickel USA in Massachusetts. *Id.* at ¶ 13. Bickel Germany was served "through service upon its agent Bickel USA." *Id.* Bickel Germany has not appeared in this action or challenged the Court's jurisdiction or venue.

In a previous motion, dated September 24, 1992, Bickel USA asked this Court to dismiss this action on the ground that "this case had previously been filed in the United States District Court in the Western District of Massachusetts." Affidavit of Charles B. Manuel, Jr., dated November 25, 1992, ("Manuel Aff."), Exh. A. This Court granted Defendant's motion to dismiss, but subsequently vacated its order of dismissal after receiving a letter, dated October 22, 1992, from Charles B. Manuel, attorney to the plaintiffs, stating:

Contrary to Bickel-USA's unsworn assertions, the same action is not pending in another court. A related but not identical action brought by Bickel-USA against USBN and ABN is pending in the United States District Court for the District of Massachusetts. The action does not include E. Bickel GmbH, a defendant here, nor does it address USBN and ABN's claims in this action.

*Id.*, Exh. B at 3.

Defendant Bickel USA now moves this Court to take one of the following courses of action: (1) reinstate its previously vacated order of dismissal and sanction Plaintiffs' counsel for alleged misrepresentations in its October 22, 1992, letter, (2) transfer this action to the Western District of Massachusetts, or (3) stay this action pending a determination of the parallel action in the Western District of Massachusetts.

## DISCUSSION

### I. REINSTATEMENT AND SANCTIONS

Defendant Bickel USA seeks reinstatement of this Court's prior order of dismissal and Rule 11 sanctions against Plaintiffs' attorney on the ground that the attorney, Charles B. Manuel, intentionally misrepresented to the Court in his letter of October 22, 1992, that "the same action is not pending in another court." The Court finds that this statement by Mr. Manuel, when taken in the context of his entire letter, as quoted above, does not misrepresent the relationship between this action and the one pending in Massachusetts. Accordingly, Defendant's motion for reinstatement of this Court's prior order of dismissal and Rule 11 sanctions is denied.

### II. TRANSFER

**\*3** Defendant Bickel USA asks this Court to transfer this action to the Western District of Massachusetts, where a parallel action is currently pending. Defendant's argument for transfer rests primarily upon the "first filed rule." This "well-settled" rule provides that "where there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience in favor of the second action, or unless there are special circumstances which justify giving priority to the second." *Motion Picture Lab. Technicians Local 780 v. McGregor & Werner, Inc.,* 804 F.2d 16, 19 (2d Cir.1986) (quoting *Fort Howard Paper Co. v. William D. Witter, Inc.,* 787 F.2d 784, 790 (2d Cir.1986)).

"The first filed rule is not to be applied in a mechanical way." *Cooperative Centrale Raiffeisen-Boerenleen Bank v. Northwestern Nat'l Ins. Co.,* 778 F.Supp. 1274, 1278 (S.D.N.Y.1991); *accord Gibbs & Hill, Inc. v. Harbert Int'l, Inc.,* 745 F.Supp. 993, 996 (S.D.N.Y.1990). "[W]here each side, after a breakdown in settlement negotiations, engages in a race to the courthouse to achieve 'first filed' status,

Not Reported in F.Supp.                                                                                           Page 3
Not Reported in F.Supp., 1993 WL 8165 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 8165 (S.D.N.Y.))**

the courts should be concerned with what the interests of justice require and not with who won the race." _National Patent Dev. Corp. v. American Hosp. Supply Corp., 616 F.Supp. 114, 118 (S.D.N.Y.1984)._

Bickel USA filed its action in Massachusetts four days before the plaintiffs filed this action here. However, ABN was not served in the Massachusetts action until approximately one month after ABN and USBN had served Bickel USA in this action. The courts in this Circuit have not definitively decided "whether the 'first filed' action is determined by the date of filing of the complaint or by the date of actual service of process." _Id. at 118 & n. 7._ "Courts also pay little regard to the date of filing when the competing suits were commenced within days of each other." _Gibbs & Hill, Inc., 745 F.Supp. at 996._ Given that Bickel USA commenced the Massachusetts action following a breakdown in settlement negotiations during which it had learned that the plaintiffs intended to commence this action in New York, and that Bickel USA filed the Massachusetts action only four days before the plaintiffs filed this action and served the plaintiffs one month after receiving service of the plaintiffs' complaint, the "first filed" rule merits little weight in the context of this motion to transfer.

The Court must therefore decide Defendant's motion to transfer under _28 U.S.C. § 1404(a)_ by balancing the significant factors. Section 1404(a) gives the district court discretion to transfer a civil action to any other district in which it might have been brought "for the convenience of parties and witnesses and in the interest of justice." Factors to consider in deciding a motion to transfer include: "the place wherever the operative facts occurred; the convenience of parties and witnesses; the principal places of business and operations of the parties to the action; the location of documents, the relative ease of access to the sources of proof, and the availability of process to compel attendance of unwilling witnesses; the plaintiff's choice of forum; a forum's familiarity with the governing law; trial efficiency and the interest of justice." _Gibbs & Hill, Inc., 745 F.Supp. at 996._

**\*4** In this case, the balance of the conveniences tips in favor of transfer to the Western District of Massachusetts. The dispute revolves around a contract negotiated mainly by means of telephone

and written correspondence between Defendant Bickel USA's office in Massachusetts and Plaintiff ABN's office in Pennsylvania. Murphy Aff. at ¶ 5. Additional negotiations took place via correspondence between Bickel Germany and ABN's facility in California. _Id._ The machines at issue were manufactured in Germany and delivered to California. The contract between the parties had no contact with New York until disputes arose regarding the timeliness of delivery and ABN's counsel in New York became involved in negotiating solutions. _See id._ at ¶ 7.

Although the convenience of the parties and witnesses appears to favor neither forum, consideration of the parties' principal places of business and operations favors Massachusetts. Bickel USA is a one- or two-person organization with only one office, which is in western Massachusetts. ABN has its principal place of business in Pennsylvania and offices in New York and California. ABN, as a larger corporation with offices nationwide, is more likely than a local corporation such as Bickel USA to possess the resources to engage in litigation outside of its home jurisdiction.

Relative ease of access to sources of proof does not appear to weigh in favor either forum. Because none of the parties has given the Court any indication that it intends to call non-party witnesses, the Court does not anticipate any problems with compelling witnesses to attend trial. In addition, the parties have not indicated that documentary evidence relevant to this action is sufficiently voluminous as to present difficulties of production in either forum.

Considerations of trial efficiency tip the balance towards transfer to Massachusetts. A parallel action, arising out of the same transaction or series of transactions, is currently pending in the Western District of Massachusetts. Even while opposing the transfer, the plaintiffs in this action concede that "[t]he two suits are clearly related, and the transfer or stay of one action certainly is warranted." Manuel Aff. at ¶ 8. Transfer of this action to Massachusetts would permit consolidation of the two actions and thereby promote the efficient use of judicial resources.

Plaintiffs argue that transfer to Massachusetts would prevent them from obtaining complete relief because

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 8165 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 8165 (S.D.N.Y.))**

Page 4

Bickel Germany is not a party to the Massachusetts action. Neither Plaintiffs nor Defendants have suggested any reason why Bickel Germany is less likely to be amenable to the jurisdiction of the District Court for the Western District of Massachusetts than to the jurisdiction of this Court. If this action is transferred to that district, all the parties, including Bickel Germany, will go with it.

Although Plaintiffs' choice of forum weighs against transfer, it does not outweigh the other factors indicating that the Western District of Massachusetts is the more convenient forum. Accordingly, Defendant Bickel USA's motion to transfer this action to the Western District of Massachusetts is granted.

III. STAY

*5 This Court's decision to grant Defendant Bickel USA's motion to transfer moots that defendant's motion for a stay of proceedings.

CONCLUSION

For the reasons set forth above, Defendant Bickel USA's motion to transfer this action to the United States District Court for the Western District of Massachusetts is granted. Its motion to reinstate this Court's prior order of dismissal and order Rule 11 sanctions is denied.

IT IS SO ORDERED.

S.D.N.Y.,1993.
U.S. Banknote Corp. v. E. Bickel & Co. GmbH
Not Reported in F.Supp., 1993 WL 8165 (S.D.N.Y.)

END OF DOCUMENT